The next case for argument is No. 25-1060, Purdue Pharma v. Accord Healthcare. Ms. Upshaw, when you're ready. Thank you, Your Honors. May it please the Court. The District Court's obviousness analysis in this case overlooks Purdue's unprecedented use of coating pans to cure extended-release oxycodone tablets in order to produce a desperately needed abuse-deterrent formulation. Purdue's use of coating pans was transformative at the time of invention. Coating pans had been used for decades to coat tablets and candy with a cosmetic coating, but no one had ever thought to use them for curing. And Accord's own expert, Dr. Appel, conceded that she knew of no prior instance where coating pans had been used in that way. The record shows that doing so would pose a host of challenges, including tablet deformation, sticking, tablet abrasion, changes in the bioavailability of the drug. There was an overwhelming need for a commercially viable abuse-deterrent formulation of oxycodone. And there was also a huge economic incentive to be the first to discover such a formulation. Purdue succeeded in doing so through its unprecedented use of a coating pan. Nothing about that was obvious. But critically, the district court's decision doesn't mention, much less analyze, most of these facts. Whether that's viewed as an error of law or an error of fact, we think that it warrants setting aside the district court's decision or at minimum vacating for the district court to analyze the coating pan limitation directly. Just to be clear, you don't dispute that the district court addressed the coating pan limitation, relied on Dr. Appel's testimony on this point, found it to be credible. I mean, your view is that there should have been more discussion of the reasons why a person wouldn't use a coating pan. Your Honor, I think that I want to go directly to the two places that I think the district court does arguably discuss coating pans and then talk about why I don't think those are sufficient. Just before I do that, though, I think the critical point here is that the district court never acknowledges that at the time of invention, coating pans had never been used in this way. Repeatedly, the court discusses coating pans in conjunction with ovens and other heating devices, but the state of the art at the time of invention was radically different with respect to ovens versus coating pans. Ovens had been used for curing before. So your view is that it would have been obvious to modify Bartholomew, however you say that, to heat the tablets after forming them in an oven, but not in a pan coater. Exactly. That's our argument on appeal here, is that the use of the coating pan is fundamentally different and there's no acknowledgment in the district court decision of that fact. But to go directly to Your Honor's question and the district court's opinion, I think that the first relevant page is Appendix 16, where the court discusses Dr. Appel's testimony that given the properties of PEO. This is the district court's fact findings, and then there's later legal conclusions. Yes, and I want to get to that one as well, absolutely. So at Appendix 16, he quotes Dr. Appel's testimony that a person, would have a good reason to expect that they may be able to use something like a pan coater. And then he goes on to discuss the testimony about the encyclopedia of polymers, and he says that that shows a reasonable expectation of success as to using convection heat. Now, I think it's interesting that the district court's opinion, or finding on Appendix 16, actually doesn't tie that evidence to coating pans specifically. It's talking about convection heat generally, and that's a flaw with a court's reliance on the encyclopedia, if you look at Dr. Appel's testimony on the encyclopedia as well. Dr. Appel references the encyclopedia, which is a general description of the properties of PEO, the polymer at issue. And it says that PEO has high resistance to plastic flow. Now, Dr. Appel conceded it's discussing pure PEO. The source says nothing about how PEO would perform in a coating pan. And even if you were to accept that there wouldn't be substantial deformation in an oven, I don't think that that answers the separate question of what would happen in a coating pan. Can I ask you another question? Yeah. I recall, but I can't remember who talked about it. I recall that there was a prior patent that was either relied on or proffered at some point that may have used a coating pan for heat. Maybe it was for heat before forming the tablets. Do I remember that correctly? So the coating art, the art that discusses the coating process, explains that heat is used to evaporate the solvent. So warm air is going into this machine. But just to be clear about what this machine is, it's a little bit like a clothes dryer. Was that a yes or a no? Is there a prior patent that somebody discussed that discloses using the heating pan for temperature prior to forming the tablets? Do I remember that correctly? Prior to forming the tablets? Prior to, yeah, I think. I'm not familiar with that. Okay, I'll try and find it. But, yeah, yeah, please. Okay, go ahead. I definitely want to address that. So my understanding of the prior art and the coating pans is that you are placing the formed tablets into the coating pan, and it's rotating to, in the typical process, to coat the tablets. A solution is being sprayed on. And the purpose of the heat- The patent I'm asking about is patent number 5585115. It's discussed at page JA5065 by the expert. Do you know what I'm talking about now? Your Honor, I'm sorry. I would have to pull that up directly. Okay. That's at page 5068. It's the 115 patent. I think it's described as disclosing heating and then coating, whereas the claims require coating and then heating. But I'm just trying to figure out if there's some prior art that talks about using a pan coater to heat independently of coating. So 5068, is that the testimony? I believe so. Yeah, yeah, yeah. So I believe this is discussing the Sherwood patent, which a court relies on generally to say that coating pans could reach temperatures up to 60 to 70 degrees. So there's no question that you are heating the tablets in a coating pan. The question is, what is the purpose of heat in the normal coating process? And the purpose of the heat is ultimately to evaporate the solvent. And Dr. Appel conceded that, and she specifically testifies at page 5190, that the goal of coating is to not change the properties of the tablet while you apply the cosmetic coating. I understand. That's the conventional use of a coating pan. But I'm just trying to understand. There is, of course, use of coating pans generally to heat, right? So heat is certainly involved in coating pans. That's the essence of a court's case. And then Bartholomew, as I understand it, teaches all the steps of the claim, including forming the tablets and then heating. But it uses a different piece of lab equipment to do that heating step. And then the expert says it would have been obvious to use a pan coater instead because the tablets are already in the pan coater, and the pan coater is something that could do this on a volume basis, unlike the equipment that's described in Bartholomew. I just want to make sure, if you agree, that those are the facts found and the issue presented. So that is a court's theory of the case, and that is Dr. Appel's? That's what the district court found. Testimony. I think that that is, to the extent the district court made specific findings on the coating pan, I think that's consistent. And Appendix 42 is the other place where the district court specifically speaks about the coating pan and says it would be attractive to be able to use the same machine for two purposes. But even if you accept that, you don't get to the reasonable expectation. Doesn't the coating pan provide the scalability that is missing? And isn't Appel saying it's pretty obvious that that would be a way to scale up from the Bartholomew process? I think what that loses sight of, though, is why would someone think this would actually work at the time? Coating pans had been around. So this is reasonable expectation of success. Precisely. But, I mean, originally you said that the district court erred by not addressing the issue. And on page A42, there's a statement, I credit Dr. Appel's testimony that a coating pan is a common piece of equipment and that a poser would find it attractive to cure the matrix tablets in a coating pan because doing so would offer the advantage of being able to cure the tablets and coat them using the same equipment. Right? I mean, that sounds like the district court addressed the issue. So, Your Honor, I think that that language doesn't say anything about reasonable expectation of success. Of course, it would be attractive. The problem that I see is that it's sort of a shorthand to say we have Appel's testimony and the court, district court, is saying embrace it, that testimony. You're sort of saying, well, not only does the district court have to embrace it, they have to then reiterate every point that the expert made. And do they really need to do that? I mean, if you take all of Appel's testimony and you say, I believe that. I'm signing on. That has everything you need to then conclude that, you know, motivation is there and likelihood of success. Your Honor, I think that Dr. Appel's testimony, if you look at Dr. Appel's testimony, it is insufficient on its face to actually sustain a court's burden. In particular, Appel concedes all of the concerns that we raised. She concedes at least five times that there was a risk of tablet damage, that there was tablet deformation risk, there was a risk of sticking. The question is why wouldn't that dissuade a person of ordinary skill in the art at the time of invention from pursuing this path, or why would they think they have a reasonable expectation of success? And I think her only real response on this is completely inadequate. If the court looks at Appendix 5594, for example, you have Dr. Appel, and she first concedes that when you watch the coding process, you would say, wow, you're putting a lot of energy into that system. There is the potential you could damage the tablets. And then her solution to that is to say, we always watch for that, and we're sort of used to adjusting the process parameters to ensure our product isn't damaged. Now, that is not about the time of invention. And this court said in In Touch and has said many times before that the question, obviously, of course, is at the time of invention. For Dr. Appel to testify that as she was testifying they knew how to adjust the process parameters doesn't tell you anything about the time of invention. And she uses this type of formulation, oh, we watch for that, we would account for that repeatedly throughout her testimony when conceding that these would be serious challenges. And there's nothing else that gets to that. The one other kind of question. I think this is all part of a larger conversation, right? And if you go back to 5591, the question is, in your opinion, would a concern about tablet safe have led a person of skill away from being a top professional? That seems to me to be asking the right question. What a person of skill would have known at the time. Maybe they didn't add in the known at the time, but I think we can presume that that's what they're talking about. And then everything follows from that. And they don't repeat what would a person have known at the time over and over again, but that's what her testimony is related to. I think it's – I don't think so, respectfully, Your Honor. I think that when you look at the – If we disagree with that and we find that this is relevant testimony as to what a skilled artisan at the time would have thought, then isn't it sufficient to support the district court's reasoning on expectation of success? Your Honor, at minimum, I think we would want to know what the district court thought about the problems like sticking. Undisputed, there would have been concerns about sticking, and yet there's no mention of that. What about the concerns about tablet abrasion? There was specific testimony about that. Dr. Appel never responds to that concern, and it doesn't appear in the district court's opinion. And more fundamentally, the district court never acknowledges that coding passages had just never been used this way before. Everybody agrees that these were widely available, but especially when you factor in the broader context here, we're in the midst of a dire public health crisis that had persisted for years, nearly a decade. And the idea that it was obvious to use a machine that was right in front of everybody and had been for up to 30 years, I don't think that that's right. I think that that fact underscores that this was surprising. The court was aware of that. You're chiding the court for not saying it, and I'm not sure why you think that the court should have to say it. That issue was in the case, and presumably the judge considered it. So why does it have to be explicit? Sure. So I think that we do need factual findings in order to know how the court resolved these concerns. And it's striking. The district court absolutely recognized in the post-trial hearing, he said, this is what I'm struggling with most is the coding pan limitation. And he asked the court, what would happen if I found that non-obvious? And a court, of course, said, you know, then we lose because we use a coding pan for our generic formulation. And what we don't know from the district court's decision is how he ultimately resolved that struggle. I think at minimum that warrants vacater. This court has, of course, set aside obviousness findings with an opportunity for the district court to consider issues again. I think that that is the appropriate court here. But the issue was ventilated, and you don't have a judge rule. So I guess I'm missing what you think the judge should have done. Your Honor, I think when you look to the decision, there's no acknowledgment of the unique state of the art for coding pans at the time or of the unique challenges that would be posed. And so the question is, what did the district court think about those? And I don't think that we have the answer to that question, especially against the backdrop of the art at the time and the dire health consequences. And I know my time is up. Yes, you followed your time. I'll restore your time. Thank you. Yes, sir, ma'am. Good morning, Your Honors, and may it please the court. Judge Bryson committed no legal error. He addressed Claim 18, the coding pan limitation, independently. He provided sufficient factual findings on the pertinent issues in full compliance with Rule 52A, the Federal Rules of Civil Procedure, which is the applicable legal standard, which Purdue neglects to even address. His factual findings were not clearly erroneous. They were supported by Dr. Appel's testimony, which itself was supported by documentary evidence. And so we ask that you affirm. I'd like to begin with two points from Purdue's reply brief we haven't had the opportunity to respond to. First, on page 5, footnote 1, Purdue argues that a court abandons 112 defenses. That's simply untrue. And Judge Bryson acknowledged at Appendix 45 that we had presented 112 defenses. He simply didn't need to reach them. So while we're asking you, obviously, to affirm to the extent you're not, certainly remand would be necessary for Judge Bryson to consider that issue. The second thing, twice in Purdue's reply brief, Purdue argues that accords expert Dr. Appel said, and I quote, most people would probably use an oven, end quote, curing, citing Appendix 5084. I urge you to look at the full quote, which is, at lab scale, I think most people would probably use an oven because they're readily available in just about any lab that you're in. But if you're trying to manufacture at scale, she explained the tremendous desirability of using a coating pan, which could both scale up the heating process, but also provide the tremendous advantage that in one piece of equipment you could cure and then coat. What do you say to your counterpart's argument that the district judge, sitting by designation as a district judge, should have explicitly acknowledged that the coating pan had never been used before? I think your question was spot on. There was no dispute about that. Our court did not argue that there was prior art teaching the coating pan in this way. So I think Judge Bryson clearly understood that. Under Rule 52A, it's clear, the Federal Circuit cases are clear, you don't have to restate every single aspect of your thinking. You have to provide the ultimate sufficient facts so that the court can understand. And I think as your questions make clear, you all understand why Judge Bryson found a motivation. Would you just refer to the district court judge? Sure. I mean, I know who it is, but that's not going to favor into my decisions. Understood, Your Honor. Thank you. I want to ask you, could you address reasonable expectation of success? Yes, Your Honor. I'd like to point out two things. First of all, my friend on the other side repeatedly said the record showed that there were all of these things. Well, the record didn't show that tablet abrasion would be a problem or that tablet deformation would be a problem. Their inventor testified that he had personal concerns about dissolution and tablet shape. The district court addressed those concerns in Appendix 31. Okay, thank you. Stating that these concerns seem to be his personal concerns, they don't address the views of a person of scale at large, and that it must be judged in light of his affiliation with Purdue, which is fully consistent with this Court's jurisprudence in cases like Allergan v. Apotex that inventor testimony must be treated with skepticism. Dr. Appell addressed those concerns, citing documentary evidence, for example, with regard to dissolution. She explained in Appendix 5578 to 5579, citing a Dow brochure, which is Appendix 8338, that it was well known in the art how to modify the dissolution rate of a polyethylene oxide tablet, including tablets that had been heated by a process known as hot melt extrusion. I think there's an argument that the coating pan, nobody would have thought it would have worked. I mean, where is that addressed? Sorry, Your Honor? The argument made by your friend was that the coating pan, there was evidence that a coating pan would not have worked in this process. Where is that addressed? It's addressed by Dr. Appell repeatedly, Your Honor. As I was explaining, at 5578 to 5579, it would work. At 5992 to 5995, she's addressing why it would work in terms of overcoming any concerns with tablet shape and with tablet sticking. And what about in the opinion? In the opinion, she credits Dr. Appell's testimony at Appendix 16. She notes that explicitly citing her testimony and her citation to the Encyclopedia of Polymer Science, noting that given the properties of polyethylene oxide, a person of skill would have expected success. That was unrebutted. What you did not hear from Purdue is any expert testimony addressing the properties of polyethylene oxide or a person of skill's expectation of success. And this is right below this where the distributor judge says, I find this testimony credible and unrebutted? Correct, Your Honor. Okay. And that's on expectation of success, which is a reasonable expectation of success, which is a question of fact, right? Correct, Your Honor. Okay. Thank you. Purdue seems to be saying that really the inventive step here is that the coating pan, one would even have thought of it as in its usual use, trying to avoid heating because then it will damage the pharmaceutical. And isn't it – aren't they right that it was kind of an inventive leap to then say, oh, we're going to use this for the opposite of sometimes what you're concerned about when you're using a coating pan? Your Honor, I disagree that it's an inventive leap. The goal of coating is to have a coating around the tablet. Now, when that is your only goal. Then you have to be careful not to have too much heating then, right? You may have to be careful not to have too much heating if that is your goal. If your goal is not to change the properties of the tablet, you don't want to harden the tablet, then, yes, I'd agree that is a concern of too much heat. But if your goal is to get this hardened tablet in Bartholomew's, as Dr. Pell explained and was unrebutted, it's a tremendous advantage. I already have to use this heating mechanism to heat up my tablets in the coating process. Why don't I just use it now to heat a little bit higher, melt the PEO, get my hardened tablet, and then I can lower the temperature, apply my coating, and do it all in one machine? And frankly, Your Honor, that motivation is undisputed. The inventor himself admitted that despite his alleged reservations and concerns, the benefits in terms of processing efficiency were so significant that it was worth trying to use a coating pan. Dr. Pell explained a person of skill would have reached the same conclusion. Based on what was known about polyethylene oxide, they would have expected success in doing so. I did want to briefly address, Your Honor, one thing on long-felt need, which I know my friend did not get to, but I think it's clear that the argument to the district court was that there was a long-felt need for an abuse deterrent opioid formulation, full stop, that is a product. The district court addressed that argument in Appendix 27, found that Bartholomews teaches just that, a formulation that is made of PEO and oxycodone, that is heated, makes it crush-resistant, an abuse deterrent, and thus satisfies that need. Their new argument that the need was for a process, and a scalable process, simply was not presented to the district court. You can scour their briefing and you will not see that argument. Can I ask you one more question about credibility findings? Yes. So how much credit, what should we do with the credibility finding with respect to Dr. Epple's testimony and the way she testified convincingly that certain things were so? How is that reviewed? Is it reviewed differently? Your Honor, I think as cases, I want to make sure I cite the right case here, if you can give me one second. As cases like JVW cite, credibility determinations by the trial judge can virtually never be clear error. So I think it's a very deferential standard because the trial judge heard all the testimony. For example, when it came to, my friend was alluding to a video of the tablet coding mechanism. The district court judge saw that video and heard testimony from all parties about it, Your Honor. So I think it's a very deferential standard, and it can't be clear error for the district court to find an expert testimony highly credible and unrebutted. Unless Your Honors have any questions, I'm happy to see the remainder of my time. Thank you. Thank you, Your Honors. Just a few points in response. First, to the extent opposing counsel was suggesting that these problems weren't real, I think that Accord and Dr. Appel's testimony concede the existence of these concerns. And the question is, did they provide a reason to think there still would have been a reasonable expectation of success? On that, the key page that they point to, and I think the only page that they could point to, is this discussion at Appendix 16. Now, even if the court accepted all of that, it still wouldn't address separate problems with, for example, the sticking problem, which is exacerbated by the high heats that you need in order to actually reach the curing process. The fact that the goal of coding and the goal of curing are different matters, because when you increase above the melting point of the polymer, it introduces all of these problems. And then the question is, why would you think this worked when nobody had ever tried doing this for decades? Even though everybody agrees the equipment was readily available, and that in theory there would be efficiency gains. And there's no answer to that question as to a number of problems, even if you accept this encyclopedia testimony. Now, on the encyclopedia itself, Dr. It has to be clear, there's no dispute that heating the tablets is something that was known, or as discussed by Bartholomew's, right? It's a question of heating it in this particular equipment that could be potentially a problem. Just to make sure I got that in my head right. That's exactly right, and I think that Accord's narrative of this case is, and Dr. Appel at one point says, That is just not true when you look at the record. Heating up to the melting point of the polymer changes the properties of the tablets and produces a whole separate set of problems. And we don't know how those were resolved. All of this about heating and hardening and all of that is in Bartholomew's. All we need here is coding. That's what this case is about. It's not about the problems associated with heating in general. So I think that this gets to the exact nub of the issue. Bartholomew's was a tablet press. So you actually had compression and the tablet was placed in the heat. And so, yes, the problem is that all of these unique challenges are posed by switching to a massive device where you have hundreds of pounds of tablets being agitated at once. That's worlds away from Bartholomew's. It's also worlds away from a traditional oven where you have stationary tablets. And Dr. Mannion's testimony, and there's evidence in the patents themselves, was that that unique process posed a whole host of challenges and required extensive experimentation. I do think that this is a case where hindsight bias is a serious risk. And Appell's testimony that we can just adjust the parameters and it's no problem is quintessential hindsight bias testimony against the dire public health need that this resolved. Thank you, Your Honor.